UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

                - against -

SHANADO PHILLIPS,

                Defendant.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

No. 13-CR-631 (RJD)

RAYMOND J. DEARIE, United States District Judge:

Defendant Shanado Phillips is charged under 8 U.S.C. §§ 1326(a) and 1326(b)(2) with illegal reentry into the United States subsequent to deportation for an aggravated felony. Phillips moves to dismiss the indictment pursuant to 8 U.S.C. § 1326(d) on the basis of a fundamental procedural error in his removal proceeding. For the reasons stated below, the Court grants defendant's motion.

<u>BACKGROUND</u>

Phillips was born in Jamaica. In 1983, at the age of nine or ten, he moved to the United States with his mother, twin brother, and younger sister. His father and older sister were already living in the United States. Phillips and his family lived in Brooklyn with his aunt for a few years until they were able to afford their own apartment. Two more of Phillips's sisters then moved from Jamaica to join the family. All of the members of Phillips's immediate family and much of his extended family now live legally in the United States.

Phillips was granted status as a permanent resident a year after moving to the United States, and he attended New York City public schools. He attended Jackie Robinson Junior High, and then Automotive High School. During high school, Phillips worked at an automobile service garage for the sanitation department. After graduating high school, Phillips worked a variety of jobs, including as a custodian at the World Trade Center, a messenger for a service in

Manhattan, a sales associate at the Gap Store, a parking attendant at Shea Stadium, and a plumber's assistant. He also enrolled in college, taking classes in business management and then heating ventilation and air conditioning.

During these years, it is clear that Phillips played a significant role in the lives of a number of his family members. His mother testified that he would help her with chores, take her to medical appointments, and contribute financially. Phillips's sisters also testified that he served as a father figure for many of his nieces and nephews whose biological fathers were not present in their lives.

Phillips's brief but not insignificant criminal history began and ended when he was 21 years old. On January 29, 1995, Phillips was arrested for armed robbery. His brother was competing with another man for the affections of a woman, and Phillips agreed to help his brother confront the man. When the man became aggressive, Phillips waved an inoperable gun in the air to scare the man off. Phillips and his brother then robbed the man of his personal belongings. Phillips was arrested and indicted in Kings County Supreme Court for robbery in the first degree, two counts of robbery in the second degree, and three counts of grand larceny in the fourth degree. He was released on bail and continued to attend school and work.

A few months later, on June 19, 1995, Phillips again committed another robbery. Phillips testified that he was motivated to steal money to give to his family before he was sent to prison for the first offense. Phillips hatched a plan with a friend of his to rob a fast food restaurant where the friend worked. The plan was for Phillips to bring a fake weapon, put on an act for the restaurant employee not in on the plot, and then steal some money. Phillips was arrested and indicted in New York County Supreme Court for robbery in the first degree, robbery in the second degree, and unlawful imprisonment for a robbery.

On July 10, 1995, Phillips pled guilty in Kings County Supreme Court to robbery in the second degree, and admitted that he had a handgun during the offense. On September 12, 1995, he was sentenced to 2 to 6 years' imprisonment. On June 13, 1996, for his second robbery, Phillips pled guilty in New York County Supreme Court to robbery in the first degree. At his plea, Phillips admitted to brandishing a pistol, although he now claims there was no gun used during the robbery.[1] Phillips was sentenced on June 27, 1996, to 2 ½ to 7 ½ years' imprisonment, to run consecutively to the sentence imposed for his first robbery.

While incarcerated, Phillips began to turn his life around. As he told the Court, he "made up [his] mind from that point . . . [that he] would never return [] behind bars" and would "look forward to being a better man." He took a number of vocational programs in which he excelled. For instance, in his welding class, the instructor wrote on a final evaluation that Phillips's work was "outstanding" and that he had a good "attitude and drive." He also became certified as an HIV and AIDS prevention counselor, and taught and worked with other inmates.

Phillips maintained a close relationship with his family while in prison. A number of his relatives testified to the important role Phillips continued to play in their lives even while he was incarcerated. For example, Phillips's nephew testified that Phillips was a "second father" to him and taught him how to cook. Phillips's niece testified that even from prison he was her confidant, encouraging her to stay in school and pursue higher education and acting as a key source of support when she was diagnosed with lupus.

On February 7, 1997, while Phillips was serving his prison sentences, the Immigration and Naturalization Service ("INS") notified him that he was subject to deportation as a result of his convictions and issued a warrant for his arrest. On May 7, 1997, Phillips appeared for a

---

[1] At the Court's <u>Copeland</u> hearing, Phillips credibly testified that he did not have a gun during the robbery but pled guilty to armed robbery because he was "misdirect[ed] by [his] lawyers" who told him that pleading guilty to the charged offense would result in a shorter sentence.

deportation proceeding before an immigration judge ("IJ"), but the proceeding was adjourned so

he could obtain an attorney. On July 10, 1997, the deportation hearing was reconvened and

Phillips, unable to procure an attorney, proceeded *pro se*. Finding that the INS had proven that

Phillips was "an alien from Jamaica" that has been "convicted of an aggravated felony, second

degree robbery," the IJ ordered Phillips deported to Jamaica. The IJ also told Phillips that "there

is no relief that I'm aware of . . . that would allow you to stay in this country legally." The IJ

asked Phillips whether he wished to appeal; Phillips confirmed that he did, and the IJ gave him

the paperwork for an appeal. No appeal, however, was taken.

On September 13, 2000, Phillips moved *pro se* to reopen the deportation proceedings,

claiming that he had been denied an opportunity to apply for a discretionary waiver of

deportation under former § 212(c) of the Immigration and Nationality Act. On October 5, 2000,

the IJ denied the motion as untimely. On February 23, 2001, Phillips appealed the denial of his

motion to reopen. The Board of Immigration Appeals ("BIA") reopened the proceeding

"because of a significant change in the law in 2000," and remanded the matter to the IJ to

"afford[] [Phillips] an opportunity to apply for relief under section 212(c)."

On June 11, 2001, the IJ held a hearing and informed Phillips that a hearing would be

held on July 25, 2001, "to see whether or not [the IJ would] let [Phillips] stay here." Phillips

appeared *pro se.* The IJ instructed Phillips to "bring some witnesses who can tell about the good

things that [Phillips has] done since [he has] been in the United States." The IJ also told Phillips

that "letters from correctional officers or priests or ministers or whatever within the prison

system or people on the outside" can be helpful at the hearing. That hearing, however, was never

held. At the prompting of the INS, the IJ determined that because Phillips had "served more than

five years . . . [he was] not qualified for the 212(c) hearing." The IJ, however, instructed Phillips

to appeal, stating that "you have nothing to lose by appealing [that decision], and if I were in your shoes, I'd appeal it too. . . . I'm going to tell you how to appeal this . . . you should appeal . . . [on the grounds that] the immigration judge should not have applied that five year bar." The IJ gave Phillips the paperwork for an appeal and told him he had 30 days to appeal. This time Phillips did appeal (again, *pro se*). On September 14, 2001, the BIA affirmed the decision without opinion. Phillips moved *pro se* for reconsideration, and on November 15, 2001, the BIA again denied his appeal, this time writing that because Phillips's "actual term of imprisonment exceeded five years" he was not eligible for § 212(c) relief. Phillips did not appeal that decision.

On November 18, 2004, more than three years after the BIA's final order of removal, Phillips was removed from the United States to Jamaica. Phillips has no family or friends in Jamaica. Phillips stayed with men he met while incarcerated, struggled to find work, and had to rely on his family to send money.

In 2006 Phillips reentered the United States. Upon returning to the United States, he began working for a contracting company. He excelled in that position. A letter from the president of that company states that Phillips is "a self-starter" with an "impeccable work ethic," and that he was "an integral part of [the] team." After Hurricane Sandy, this company was so busy that it began referring overflow projects to Phillips. With the encouragement of his employer and family, Phillips eventually opened his own home renovation company—Phillips Perfections LLC—and the record is replete with letters from his satisfied customers. In 2010 he married Geraldine Phillips, a U.S. citizen. They have two children—Yatzany and Shanado Jr.— who have submitted letters about the important role their father plays in their lives. By all accounts, Phillips and his wife have been successful in what he described as "breaking the generational cycle with [his] children." Phillips has in his own way broken with his prior life. In

addition to succeeding in business, Phillips has also obtained a license, paid his taxes, made payments on his student loans, restored his credit, made gifts to charity, attended church, and was looking to buy a home before being arrested—all in his own name.  He was even called for jury duty.

On July 9, 2013, Phillips submitted his fingerprints in connection with an application for a New York State contractor license.  New York officials discovered that he had been previously removed by Immigration and Customs Enforcement.  He was arrested on September 19, 2013, and indicted on one count of illegal reentry in violation of 8 U.S.C. §§ 1326(a), (b)(2).  On April 27, 2015, Phillips moved to dismiss the indictment pursuant to 8 U.S.C. § 1326(d).  On June 11, 2015, the Court heard oral argument on the motion, and on July 7, 2015, the Court held an evidentiary hearing regarding the substance of the motion.

DISCUSSION

While "[t]he dismissal of an indictment is an 'extraordinary remedy,' reserved only for limited circumstances implicating fundamental rights," United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001), a defendant charged with illegal reentry under 8 U.S.C. § 1326(a) and (b)(2) may collaterally attack the validity of the deportation order underlying his prosecution through a pre-trial motion brought under Federal Rule of Criminal Procedure 12.  See United States v. Calderon, 391 F.3d 370, 372 (2d Cir. 2004) (affirming dismissal of an indictment alleging illegal reentry on the ground that defendant had shown the underlying deportation order was invalid).  To prevail on such a challenge, a defendant must demonstrate that "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair."

8 U.S.C. § 1326(d).  As is apparent from the plain meaning of the statutory text, "the requirements are conjunctive," and a defendant's failure to establish any one forecloses collateral attack and dismissal of the indictment on the basis of the invalidity of the underlying deportation order.  United States v. Fernandez-Antonia, 278 F.3d 150, 157 (2d Cir. 2002).

The statutory provision at the heart of Phillip's motion to dismiss the indictment is INA § 212(c), previously codified at 8 U.S.C. § 1182(c) (1995).  Prior to 1990, the Attorney General was authorized to grant discretionary relief from deportation under former § 212(c) to certain lawful permanent resident aliens who like Phillips had lawfully resided in the United States for seven consecutive years.  8 U.S.C. § 1182(c) (repealed 1996).

Congress amended the INA in 1990 to eliminate § 212(c) relief for any "alien who has been convicted of an aggravated felony and has served a term of imprisonment of at least 5 years."  Immigration Act of 1990, Pub. L. No. 101-649, § 511(a), 104 Stat. 4978, 5052 (Nov. 29, 1990).  In 1991, Congress again amended § 212(c) so that "an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years" is ineligible for relief from deportation.  See Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, § 306(a)(10), 105 Stat. 1733, 1751 (Dec. 12, 1991).  Congress acted a third time in 1996, amending § 212(c) to bar relief to any alien convicted of an aggravated felony, regardless of the term of imprisonment.  See Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 440(d), 110 Stat. 1214, 1277 (Apr. 24, 1996).  Later that year, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 304(b), 110 Stat. 3009-546, 3009-597 (Sept. 30, 1996), which repealed § 212(c) altogether, and replaced it with a statute not relevant to the present case.

After the AEDPA was passed, there was disagreement among the BIA, the United States Attorney General, and the courts as to whether section 212(c) relief remained available to aliens who had pled guilty to an aggravated felony *before* the AEDPA became effective. The issue was then definitively resolved when, on June 25, 2001, the United States Supreme Court held in <u>INS v. St. Cyr</u>, 533 U.S. 289, 315 (2001), that the AEDPA and IIRIRA did not apply retroactively and that "§ 212(c) relief remains available for aliens . . . whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect."

Phillips pled guilty to aggravated felonies prior to the AEDPA's enactment. He argues, therefore, that he was eligible for section 212(c) relief but was denied the possibility of such relief (1) in 1997 when the IJ misinformed him that he was not eligible for relief, and (2) in 2000 when the IJ deemed him ineligible for relief pursuant to the five-year bar. Phillips maintains that but for these errors, he would have been granted relief from deportation, and accordingly these errors nullify the present illegal reentry charge.

To succeed on this claim, as already noted, Phillips must demonstrate that (a) he exhausted administrative remedies, (b) he was deprived of the opportunity for judicial review, and (c) the entry of the order was fundamentally unfair. Only the second and third of these requirements is in dispute as the government concedes that Phillips exhausted his administrative remedies.

1.  <u>Deprivation of Opportunity for Judicial Review</u>

Under the second prong of Section 1326(d), this Court must determine, "whether judicial review was realistically available to [Phillips]—that is, whether defects in the administrative proceeding otherwise foreclosed judicial review." <u>United States v. Lopez</u>, 445 F.3d 90, 96 (2d

Cir. 2006).  The INA, as amended by the IIRIRA, precludes appeals by deportable aliens (like

Phillips) who have been convicted of aggravated felonies.  "Notwithstanding IIRIRA's

preclusion of direct appeals, however, habeas review of BIA decisions remains available under

28 U.S.C. § 2241."  United States v. Gonzalez-Roque, 301 F.3d 39, 49 (2d Cir. 2002).

The parties agree that the only form of judicial relief potentially available to Phillips was

habeas review.  The government argues that Phillips was not denied the opportunity for judicial

review under § 1326(d)(2) because the length of time between the issuance of his deportation

order and his removal gave him ample opportunity to file a habeas petition seeking section

212(c) relief.

"[T]he technical availability of habeas review is not always sufficient to constitute

available judicial review."  United States v. Copeland, 376 F.3d 61, 68 (2d Cir. 2004).  Even

"where habeas review is technically available, judicial review will be deemed to have been

denied if resort to habeas proceeding was not *realistically possible*."  Id. (emphasis supplied).  In

Copeland, the Second Circuit specified that the opportunity for judicial review will be deemed to

have been denied "where the interval between entry of the final deportation order and the

physical deportation is too brief to afford a realistic possibility of filing a habeas petition."  Id.

In United States v. Calderon, the court elaborated on its analysis in Copeland, finding that a

defendant-alien demonstrated that "he was deprived of the opportunity for judicial review

because, although he had habeas review available to him, (a) he was mistakenly advised by the IJ

to the contrary, and (b) his speedy deportation further limited his ability to seek review."  391

F.3d at 376.  In United States v. Lopez, 445 F.3d 90, 99 (2d Cir. 2006), the Second Circuit added

that even when "the interval of time" makes it realistically possible for an alien to seek habeas

relief, an opportunity for judicial review may still be deemed denied "where the government

affirmatively misleads an alien about the availability of relief."  Most recently in United States v. Gill, 748 F.3d 491, 505 (2d Cir. 2014), the court emphasized that where aliens are "incorrectly informed that they were ineligible for § 212(c) relief by the BIA," such misinformation can "function[] as a deterrent to seeking judicial review by way of habeas."  Gill makes clear that an opportunity for judicial review is not denied *every time* an IJ or the BIA provides incorrect information to an alien or erroneously rules in a deportation proceeding.  Rather, the Second Circuit has stressed that judicial review was not realistically possible for the alien in Lopez because he was "incorrectly informed that [he was] ineligible for § 212(c) relief by the BIA," he "was a pro se respondent at the time that he was given incorrect information by the IJ," and "[t]he availability of relief from the deportation order was exceedingly murky at the time" because of the state of the law.  Id. at 505.

In this case, the IJ and BIA erroneously told Phillips that relief was not available to him under § 212(c) because of the five-year bar.  As in Lopez, "[h]ad the IJ (and subsequently the BIA) not provided erroneous information to [the defendant] about the legal availability of § 212(c) relief, it might have occurred to [the defendant] to look for other remedies at law. The fact that an administrative body told him that no such relief existed is a powerful deterrent from seeking judicial relief."  Lopez, 445 F.3d at 98.  The fact that the IJ told Phillips to appeal does not mitigate the effect of the misinformation as the BIA affirmed the IJ's decision and then denied Phillips's motion for reconsideration.  The BIA's denial of relief coupled with its subsequent written opinion denying reconsideration was a "powerful deterrent" to Phillips to pursue additional review.  See United States v. Clinton, 653 F. Supp. 2d 446, 451 (S.D.N.Y. 2009) (finding that defendant's failure to seek judicial review was excused by statements "at

every step of his proceedings, by his attorney, the IJ, and the BIA, that section 212(c) relief was not available to him").

Two other factors weigh in favor of the Court's finding that habeas review was not a realistic possibility. First, unlike the alien in <u>Lopez</u> (who was *pro se* in front of the IJ but was later represented) or the alien in <u>Gill</u> (who had representation), Phillips was *pro se* through the entirety of his deportation proceeding. The absence of counsel compounds the effects of the incorrect information provided by the IJ and BIA. Second, in 2001 when Phillips appeared before the IJ and later appealed to the BIA the state of the law was "exceedingly murky." As Judge David Trager summarized then, "the issue [of] . . . whether time served in prison after an initial erroneous BIA decision is reversed should count toward the INA § 212(c) five year bar, when the initial erroneous decision was reached before the prisoner had served five years . . . has not been addressed by the Second Circuit, and district courts within the circuit have decided the issue differently." <u>Falconi v. I.N.S.</u>, 240 F. Supp. 2d 215, 218 (E.D.N.Y. 2002) (collecting cases). Thus, had Phillips surveyed then-existing case law, it is hardly clear that habeas review would appear to be a realistic possibility for relief.

Accordingly, this Court finds that because the IJ and the BIA erroneously told Phillips that he could not obtain § 212(c) relief because of the five-year bar, judicial review was not realistically available to him.

### 2. Fundamental Unfairness

Under the third prong of section 1326(d), this Court must determine whether the entry of the deportation order against Phillips was fundamentally unfair. "To show fundamental unfairness under Section 1326(d)(3), a defendant must show both a fundamental procedural error and prejudice resulting from that error." <u>Copeland</u>, 376 F.3d at 70 (quoting <u>United States v.</u>

<u>Perez</u>, 330 F.3d 97, 104 (2d Cir. 2003)) (internal quotations and modifications omitted).  The alien bears the burden of showing fundamental unfairness.  <u>See</u> <u>United States v. Daley</u>, 702 F.3d 96, 100 (2d Cir. 2012).

Phillips identifies two procedural errors in his motion.  First, he argues that the IJ erred by not informing him at the time of his deportation proceeding of his right to seek § 212(c) relief.  As Phillips correctly points out, the IJ at his initial deportation proceeding stated that "there is no relief that I'm aware of . . . that would allow you to stay in this country legally," and otherwise failed to advise him of his right to seek relief under § 212(c).  Generally, "[a] failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3)."  <u>Copeland</u>, 376 F.3d at 71; <u>see also</u> <u>United States v. Gomez-Hernandez</u>, 777 F. Supp. 2d 464, 472 (E.D.N.Y. 2011).

The government argues that Phillips was not prejudiced by this error because the BIA reopened his case and he was given a new proceeding.  The government would be correct but for the second error identified by Phillips: the IJ and BIA's subsequent denial of § 212(c) relief on the basis of the five-year bar.  In <u>Edwards v. INS</u>, 393 F.3d 299, 307 (2d Cir. 2004), the Second Circuit considered whether time served in prison after an error by an IJ or the BIA is reversed should count toward the five-year bar when the initial erroneous decision was reached before the alien had served five years.  The court concluded that it should not, and that "an award of *nunc pro tunc* relief is the appropriate remedy for [] aliens . . . [who] accrue[] more than five years' imprisonment subsequent to the legally erroneous denial of their § 212(c) applications."  <u>Id.</u> at 312.  Applying <u>Edwards</u>, the IJ and BIA erred by applying the five-year bar to Phillips's application for § 212(c) relief.  As the government concedes in a footnote in its brief, since the initial erroneous denial of § 212(c) relief occurred before Phillips had served five years in prison,

when his deportation proceeding was reopened in 2001, the IJ and BIA should have considered Phillips's eligibility for § 212(c) relief *nunc pro tunc*, that is, as if he had not yet accrued five years' imprisonment.

In sum, the IJ committed a procedural error in 1997 by misinforming Phillips of his eligibility to seek § 212(c) relief, and that error was not cured by the reopening of the proceeding in 2001 because the IJ and BIA then erred by applying the five-year bar to Phillips's application.

Since Phillips has demonstrated a procedural error in his deportation proceeding, he "must show that he likely would have been granted Section 212(c) relief if he had obtained a hearing." Copeland, 376 F.3d at 73. "[P]rejudice is shown where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted Section 212(c) relief." Id. A court must "play the role of prognosticator, and divine whether, had the error not occurred, the defendant would likely have obtained immigration relief." Edwards, 393 F.3d at 311.[2] Accordingly, "[r]esolution of the prejudice issue . . . is somewhat akin to a trial within a trial." Copeland, 376 F.3d at 73-4. The Second Circuit has directed district courts to hold a hearing much like the § 212(c) hearing that the IJ should have held initially and to balance "the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the best interests of this country." Id. at 74 (quoting Matter of Marin, 16 I. & N. Dec. 581, 584 (BIA 1978)).

In 1978, the BIA delineated both the adverse and positive factors that immigration judges should weigh when considering a § 212(c) application. See Matter of Marin, 16 I. & N. Dec. at

---

[2] In this role the Second Circuit has admonished district courts to "tak[e] into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." Copeland, 376 F.3d at 74. As others have noted, that task is "made difficult by the absence of published IJ decisions from which the court could seek guidance." United States v. Russo, No. 02-CR-482 (ARR), 2005 WL 1243311, at *6 (E.D.N.Y. May 25, 2005).

584-85.  Factors that were deemed adverse include "the nature and circumstances of the exclusion ground at issue, the presence of additional immigration law violations, the existence of a criminal record and its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident."  Lovell v. I.N.S., 52 F.3d 458, 461 (2d Cir. 1995) (citing Matter of Marin, 16 I. & N. Dec. at 584-85).  On the other hand, favorable considerations include "family ties within this country, residence of long duration in this country, evidence of hardship to the alien and alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, evidence attesting to good character, and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation."  Id.

Although, between 1989 and 1995, 51.5% of the applications filed for § 212(c) relief were granted, St. Cyr, 533 U.S. at 296 & n. 5,[3] an alien with a lengthy or violent criminal history faced a significant hurdle to demonstrate that his application merited favorable consideration. The BIA has indicated that "as the negative factors grow more serious, it becomes incumbent upon the alien to introduce additional offsetting favorable evidence, which in some cases may have to involve unusual or outstanding equities."  Matter of Buscemi, 19 I. & N. Dec. 628, 633-34 (BIA 1988).  "Outstanding equities include long-term lawful residence in the United States, United States citizen dependents and other family ties, a history of regular employment, and evidence of rehabilitation."  Russo, 2005 WL 1243311, at *5 (collecting decisions by the BIA).

Of particular importance to the present inquiry is the question of from what point in time the adverse and positive factors should be assessed.  In United States v. Scott, 394 F.3d 111 (2d Cir. 2005), the Second Circuit indicated that "in assessing whether the defendant-alien had a

---

[3] The Court awards only minimal weight to this statistic.  It does not reflect "what proportion of those successful waiver applicants were convicted of serious violent felonies," United States v. Aguirre-Tello, 353 F.3d 1199, 1210 (10th Cir. 2004), and is based on a collection of data predating Phillips's initial deportation proceeding.

reasonable probability of not being deported at his proceeding . . . the district court should reconstruct events as they existed at the time of the disputed deportation proceeding, without considering future occurrences." Id. at 119 (holding that the district court erred by considering "*ex post* data" in the form of the defendant's criminal conviction after being deported). However, in United States v. Daley, 702 F.3d 96 (2d Cir. 2012), the Circuit elaborated that "[w]hile an extreme reading of Scott could suggest that the district court should not consider anything that occurred or could have occurred after the day of the removal order, the upshot of Scott is to prohibit consideration of *criminal conduct* occurring after entry of the removal order." Id. at 102 (permitting consideration of "*already completed* conduct" as part of a district court's "inherently speculative role"). Consistent with Daley, district courts have not "read the temporal limit announced in Scott as a categorical bar" to considering future events as evidence of "what would have been reasonably foreseeable to an IJ hearing testimony." United States v. Moe, No. 02-CR-888 (RJD), 2008 WL 1850650, at *3 n.3 (E.D.N.Y. Apr. 24, 2008); see also United States v. Castro, 472 F. Supp. 2d 321, 334 (E.D.N.Y. 2007) ("courts can . . . consider relevant future hardships that an immigration judge would have been able to easily foresee at the time a defendant was improperly denied his opportunity for § 212(c) relief"). Daley also leaves open the sensible suggestion that district courts can consider favorable factors occurring after entry of the removal order—even if they are not easily foreseeable—in the interest of determining whether the granting of section 212(c) relief appears in the best interests of this country.[4]

---

[4] There are sound reasons for treating *ex post* data about criminal conduct differently than evidence about subsequent favorable considerations. Psychological research suggests that Courts are likely to assign a disproportionate amount of weight to subsequent criminal conduct as a result of conformity and hindsight bias. See, e.g., Charles G. Lord *et al.*, Biased Assimilation and Attitude Polarization: The Effects of Prior Theories on Subsequently Considered Evidence, 37 J. Personality & Soc. Psychol. 2098, 2102-08 (1979) (noting that "people tend to interpret subsequent evidence so as to maintain their initial beliefs" and "to judge confirming evidence as relevant and reliable but disconfirming evidence as irrelevant and unreliable"). Excluding *ex post* data about criminal conduct protects defendants from prejudice while not unfairly leaving the government without recourse. The government can, after all, bring a separate criminal action for unlawful conduct occurring after a defendant's

However, to the extent the Court's inquiry is to be limited temporally, the relevant date for evidence that might bear on an IJ's ruling for Phillips's application is July 25, 2001, the date the IJ indicated that he was going to hold a § 212(c) hearing after Phillips's proceeding was reopened (but before he was told he was ineligible).

As already noted, on July 7, 2015, this Court held a <u>Copeland</u> hearing to determine whether there was a reasonable probability that Phillips would have been granted § 212(c) relief based on a weighing of the above factors, viewing the merits of his claim from the standpoint of an IJ considering the evidence in 2001. At the hearing, Phillips testified first, followed by his mother and father, three of his sisters, his niece, his nephew, and two of his friends. Additionally, Phillips's wife, children, two cousins, another niece and nephew, his mother-in-law, and two friends also appeared and were prepared to testify. His wife and children also submitted letters to the Court. The Government did not call any witnesses.

On the negative side of the ledger is the obvious and not easily countered—Phillips's convictions in 1995 and 1996. These, of course, were convictions for violent robberies, and therefore constitute "serious" offenses as generally understood in the § 212(c) context. Because outstanding equities are required to overcome a pattern of serious crimes, Phillips bears a heavy burden indeed. However, the nature of these offenses alone do not preclude § 212(c) relief altogether. <u>See</u> <u>United States v. Peters</u>, 751 F. Supp. 2d 404, 414 (E.D.N.Y. 2010) ("Historically, IJs have granted § 212(c) relief from time to time on the basis of countervailing equities even when an alien was convicted of multiple and/or violent offenses."). These two incidents constitute Phillips's only exposure to the criminal justice system, and the circumstances surrounding the crimes indicate that he was unlikely to be a recidivist. In the case of his first

---

deportation proceeding, or bring a removal proceeding, if necessary, based on subsequent criminal conduct. On the other hand, a defendant prevented from introducing evidence of favorable facts occurring after his deportation proceeding is, as a practical matter, left without opportunity to invoke those equities before being deported.

offense, he was pulled into his brother's feud with another man over the affections of a woman, and things escalated out of control. And as explained quite credibly, the second episode was close in time and essentially related as it occurred on the eve of his surrender as an ill-advised effort to provide some financial support to the family members he was about to leave behind. Both incidents, while marred by the poor judgment of a 21-year-old, reflect Phillips's desire to help his family. They do not suggest a pattern of future criminality. He also had no prior immigration law violations, and the government presented no evidence at the <u>Copeland</u> hearing indicative of bad character or undesirability.

On the other hand, Phillips also had considerable favorable equities at the time of his deportation proceeding. First, and most importantly, at the time of his deportation proceeding (and still today) Phillips had substantial and meaningful family ties in the United States, including all of his immediate family and most of his relatives. By all accounts, Phillips enjoyed a close and loving relationship with his family prior to and during his incarceration. Indeed, Phillips's mother testified convincingly that before going to prison "[h]e was a great role model" and his "nieces and nephews . . . look[ed] up to him." Phillips's sisters also testified that he was a strong role model for their children (many of whom did not have fathers in their lives) and he acted as a father figure, providing guidance and in some instances financial support to his nieces and nephews. Additionally, Phillips's mother testified that his deportation "was the wors[t] thing [that ever] happened" because of the void it left in the Phillips family, and because Phillips had no family in Jamaica.

Other equities that would have weighed strongly in Phillips's favor are his relatively lengthy legal residency in the United States, his work positive history prior to incarceration, and his documented efforts at rehabilitation while in prison. Phillips entered the United States at the

age of nine or ten and was a lawful permanent resident until he committed a crime at age 21. At the time of his deportation proceeding, Phillips had spent more than half his life in the United States. During this period, he had worked at a number of jobs to support himself and his family. He testified that he would give a portion of his paycheck to his mother to help with rent and food, and his niece testified that Phillips would often give money and things to his sister, who was a single teenage mother at the time. Moreover, although the evidence of Phillips's rehabilitation after his conviction is limited to the time in which he was in prison, prison records reveal that Phillips was not involved in any significant disciplinary incidents while incarcerated and had a good attitude towards staff and his fellow prisoners. Additionally, in prison Phillips completed all required rehabilitation classes and then took additional classes to further his education. In those courses, his instructors wrote very positive reviews of Phillips's performance.

In sum, recognizing that Phillips's exclusion ground was serious, it is also clear that, at the time of his deportation hearing, he would have had unusual and outstanding equities weighing in his favor. Balancing his serious but short-lived criminal history with his many years of productive and otherwise law-abiding residency in the United States, his steady work history and, most importantly, his strong family ties and lack of family in Jamaica, Phillips could have made a powerful showing in favor of § 212(c) relief. Indeed, he could have made a showing as strong, if not stronger, than was made in other cases where relief was granted. See Scott, 394 F.3d at 119-21 (finding that defendant would have had a reasonable probability of receiving a § 212(c) waiver despite four convictions prior to his deportation hearings, including two for criminal possession of stolen property, one for grand larceny, and one for unauthorized use of a vehicle); United States v. Najera-Trejo, No. 06-CR-98 (ARR), 2006 WL 2191349, at *9-10

(E.D.N.Y. July 31, 2006) (finding that defendant had a reasonable probability of receiving § 212(c) relief despite his plea of guilty on eight different charges stemming from a violent carjacking, including one count of robbery in the first degree); Clinton, 653 F. Supp. 2d at 452 (granting relief to defendant who was arrested four times for vehicle theft and served time in prison for attempted grand larceny); In re Jose Jesus Gutierrez-Murillo, No. A13 717 602, 6 Immig. Rptr. (MB) B1-72 (BIA 1988) (granting § 212(c) waiver despite defendant's convictions for selling cocaine and for voluntary manslaughter); In re Gordon, 20 I. & N. Dec. 52, 53 (BIA 1989) (granting § 212(c) waiver despite defendant's lengthy criminal history, including convictions for robbery and receiving stolen property). Accordingly, on the evidence presented at the Copeland hearing, this Court finds that there is a reasonable likelihood that Phillips would have been granted relief under § 212(c) by an IJ had a § 212(c) hearing been held.

Notably, this assessment is made based on the evidence that existed at the time of Phillips's deportation proceeding or that would have been foreseeable to an IJ. However, were the Court to consider all of the evidence presented at the Copeland hearing—that is, evidence relating to what Phillips has done since returning to the United States—there would be no question that he has established outstanding equities in favor of keeping him in the United States and keeping his family together. Since returning to the United States in 2006, Phillips was married and started a family. As a father he has provided important emotional and financial support for his wife, children, and extended family. In particular, Phillips testified and his family provided letters stating that deporting him would have a substantial negative effect on his children. Phillips's wife will either have to raise the children on her own in New York, or move her family to Jamaica.

This is a particularly strong equity in favor of keeping Phillips in the United States, but there are others. Phillips has been gainfully employed, started his own business, paid his taxes, restored his credit, and donated money to charity and family members in need. After Hurricane Sandy, he helped members of his community rebuild their homes and businesses. Besides the reentry offense for which he is charged here, Phillips has not committed any crimes since being released from prison. Nor has he attempted to evade law enforcement. Quite the opposite, he has never used a false name, he provided his fingerprints on multiple occasions, he obtained a license, and he showed up for jury duty. Phillips, in other words, has lived the type of life we hope felons will live after leaving prison. Were he a citizen, this would be a success story. While it might have been a close call in 2001, I have little doubt that if an IJ knew what we know now, Phillips would be granted § 212(c) relief.

In light of these findings, Phillips has convincingly demonstrated he was prejudiced by the procedural errors which occurred at his deportation hearing and appeal, thus satisfying the third prong of 8 U.S.C. § 1326(d).

\* \* \*

One final observation seems appropriate. Initially the Court greeted the question of equities with understandable skepticism. Two violent felonies are difficult to overlook. Even the crowd of family and other supporters filling the courtroom seemed at first blush predictable and unimpressive. But what actually occurred during the <u>Copeland</u> hearing was anything but expected. To my surprise, Phillips's hearing presentation was from the outset credible, convincing, and in all respects impressive. His testimony was itself revealing and insightful, displaying maturity, decency, and obvious candor. The witnesses called were people of genuine substance, who spoke without hyperbole, generalization, or cliché. They offered valuable insight

into the defendant's character and his standing and significance in the family and broader community. In sum, the Court concludes that under the full range of circumstances presented, Phillips's brief foray into crime when barely in his twenties should not have such a devastating impact on so many good people, as well as the defendant himself. In the Court's view, there is a high probability that an IJ considering the same circumstances would see it the same way.

## CONCLUSION

For the reasons stated above, Court finds that defendant Shanado Phillips has satisfied all three prongs of 8 U.S.C. § 1326(d) by establishing that he exhausted his administrative remedies, was denied his opportunity for judicial review, and that the entry of the deportation order against him was fundamentally unfair. As a result, the underlying deportation order violated his due process rights and cannot be the basis for the essential element of prior deportation which lies at the root of the pending illegal reentry charge. The Court must, therefore, grant his motion. The indictment charging Phillips with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2) is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
      August 3, 2015

/s/

_____
RAYMOND J. DEARIE
United States District Judge
